Marianne Dugan (OSB # 93256)
Internet e-mail address mdugan@mdugan.com
259 E. 5th Ave., Ste 200-D
Eugene, OR 97401
(541) 338-7072
Fax no. (541) 686-2137
        Of Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

| | |
|---|---|
| WESTERN RADIO SERVICES CO., an Oregon corporation; and RICHARD L. OBERDORFER, | No. 04-01346-AA |
| Plaintiffs, | PLAINTIFFS' FIRST AMENDED COMPLAINT |
| v. | (First Amendment - <u>Bivens</u> Action; Administrative Procedures Act/ National Forest Management Act) |
| UNITED STATES FOREST SERVICE; LARRY TIMCHAK; JIM McMILLIN; BOB ROCK; KRISTEN BAIL; JIM SAUSER; and DIANA HSIEH, | |
| Defendants, | |
| _____ | JURY TRIAL REQUESTED |

**JURISDICTION AND VENUE**

1.      This is a civil action for declaratory and injunctive relief, damages, and attorney's

fees, for violation of plaintiffs' First Amendment rights under <u>Bivens v. Six Unknown Named</u>

<u>Agents of the Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971); for unlawfully withholding

agency action under the National Forest Management Act ("NFMA"), 16 U.S.C. 497, in

violation of the Administrative Procedures Act (APA), 5 U.S.C. 706(1); and for agency action

PAGE 1 - PLAINTIFFS' FIRST AMENDED COMPLAINT

taken under NFMA, 16 U.S.C. 497, that is arbitrary and capricious, in violation of the APA, 5

U.S.C. 706(2).

2.      Jurisdiction for these claims exists under 28 U.S.C. 1331, and principles

established in <u>Bivens</u>, because this action arises under the laws of the United States.

3.      Venue is proper in this judicial district pursuant to the provisions of 28 U.S.C.

1391(b) in that this is a civil action wherein jurisdiction is not founded on diversity of citizenship

and plaintiffs' claims arise within this judicial district, and plaintiffs reside in this judicial

district.

**PARTIES**

4.      Plaintiff Western Radio Services Company ("Western Radio") is an Oregon

corporation with its principal place of business in Bend, Oregon.

5.      Plaintiff Richard L. Oberdorfer is president and sole stockholder of Western

Radio, and is domiciled and resides at Bend, Oregon.  Because of his close identity and financial

ties with Western Radio, whatever harm that befalls his company is also inflicted upon him.

6.      Western Radio Services Company, Inc. and its sole owner Richard Oberdorfer

operate a commercial radio communications service headquartered in Bend, Oregon.  (Hereafter,

"Western Radio" will refer to both defendants collectively except when Mr. Oberdorfer is

discussed individually.)  Western Radio provides radio services to customers including radio

telephone and pager services. Its customers include various emergency services such as sheriffs'

departments, fire districts, ambulance services, as well as government agencies such as the

Oregon Dept. of Forestry and the U.S. Forest Service ("Forest Service").

7.      Western Radio began service to the public in 1978 and constructed its first

PAGE 2 - PLAINTIFFS' FIRST AMENDED COMPLAINT

communication site on Gray Butte.  The Gray Butte Electronics Site is located on the Crooked

River National Grassland in the Ochoco National Forest, on land administered by the U.S. Forest

Service.  Pursuant to special use permits issued by the Forest Service, Western Radio operates

and maintains mobile  radio communications facilities at Gray Butte.

     8.    Defendant U.S. Forest Service is and was at all material times an agency of the

United States government, and it manages the communications site at Gray Butte pursuant to

authority granted by Congress and implementing regulations and policies

     9.    The individual defendants were at relevant times employees of the U.S. Forest

Service; and their actions and omissions alleged in this complaint were taken within the scope of

their authority as employees, officers, and/or agents, and therefore were actions and omissions of

the U.S. Forest Service; but they are sued in both their individual and their official capacities.

**FIRST CLAIM FOR RELIEF**
**(First Amendment - <u>Bivens</u> Action)**

     10.    Plaintiffs adopt by reference the allegations in the foregoing paragraphs.

**Background Facts Regarding the Nature of the Claim**

     11.    Plaintiffs exercised their First Amendment rights, beginning by filing several

administrative appeals starting in 1986, and by filing several lawsuits starting in 1993, against

the Forest Service and its employees, on various grounds, challenging adverse permitting and

leasing decisions involving plaintiffs' communication sites.  <u>See</u> <u>Western Radio Services Co.,</u>

<u>Inc. v. Espy</u>, Civ. No. 93-552-MA (D. Or.), <u>aff'd</u>, 79 F.3d 896 (9th Cir.), <u>cert. den.</u>, 519 U.S. 822

(1996); <u>Western Radio Services Co., Inc. and Richard Oberdorfer v. Espy, et al,</u> Civ. No. 94-

6323-HO (D. Or.); <u>Western Radio Services Co., Inc. and Richard Oberdorfer v. Glickman, et al,</u>

Civ. No. 95-679-MA (D. Or.), 123 F.3d 1189 (9th Cir. 1997); <u>Western Radio Services Co., Inc.</u>

PAGE 3 - PLAINTIFFS' FIRST AMENDED COMPLAINT

and Richard Oberdorfer v. Glickman, et al, Civ. No. 95-6207-TC (D. Or.), aff'd, 113 F.3d 966 (9th Cir. 1997); Western Radio Services Co., Inc. v. Veneman, D. Or. No. 01-6240-HO; 9th Cir. Appeal Nos. 02-36138 and 2 05-35342.

12.    One of those lawsuits, Western Radio Services Co., Inc. v. Veneman, D. Or. No. 01-6240-HO; 9th Cir. Appeal No. 2 05-35342, is currently pending on appeal.

13.    From the time Oberdorfer founded Western Radio, until he began suing the Forest Service, he generally experienced good relationships with the Forest Service personnel he dealt with, and their decision-making process regarding his permit requests and those of his competitors appeared to him to be even-handed.

14.    In response to Western Radio's litigation against the Forest Service, the defendants implemented a plan or policy to punish Western Radio's exercise of its right to petition the Forest Service and the courts in regard to those Forest Service permitting and leasing decisions.  The defendants' overall goal was to punish Western Radio for filing its lawsuits, thereby chilling Western Radio and other permittees' desire to pursue their First Amendment rights, by denying Western Radio permits or other Forest Service authorizations needed for Western Radio's business to continue expanding, and by granting Western Radio's competitors advantages on a selective basis in order to further chill Western Radio's desire to contest Forest Service actions or inactions.

15.    In order to prevent Western Radio from suing over their efforts to harm the plaintiffs, the conspiracy defendants implemented a second plan, to conceal their efforts to punish Western Radio for the exercise of its right to petition the courts and the Forest Service.

//////

PAGE 4 - PLAINTIFFS' FIRST AMENDED COMPLAINT

**Background Facts Regarding Gray Butte**

16.    In January 1991 Western Radio submitted an application for a new special use permit under 16 U.S.C. 497 to relocate existing antennas on the Gray Butte site to the side hill to alleviate interference with Slater Communications' facilities.  This was allowable under the existing site plan.

17.    After long and difficult negotiations, in 1996 the facility owners at the Gray Butte site agreed to a site plan revision, which included strict technical standards and which shifted responsibility for technical management from the Forest Service to the facility owners.

18.    In 1998, Western Radio complied with a request from the Forest Service that he amend his 1991 application to move its antennas, to resolve concerns that had been raised by the other Gray Butte facility owners (Slater and Day Wireless) regarding appropriate separation between antennas.

19.    Western Radio's application was denied.  Western Radio's administrative appeal of that decision was first denied; but then in 1999 then-District Ranger Byron Cheney withdrew the denial of the application and stated that he wanted to analyze and update the existing Gray Butte site plan before making a decision on Western Radio's application.

20.    No final action was ever taken on Western Radio's application.

21.    At an August 21, 2000, Gray Butte facility meeting, plaintiff Oberdorfer complained that Slater was not in compliance with the site plan.  Defendant McMillin (then the Ochoco National Forest Land and Minerals Staff Assistant) asked if Western Radio knew the extent of the noncompliance.  Oberdorfer stated that Slater would not allow inspection. McMillin asked Slater if he would agree to inspection by the other owners, and Slater agreed.

PAGE 5 - PLAINTIFFS' FIRST AMENDED COMPLAINT

The inspection was scheduled but did not occur, because Slater's employee told the other owners that Slater had decided to renege.

**Gray Butte From 2002 to the Present**

22.    Two years later, in August 2002, defendant McMillin wrote to Western Radio, with a copy to defendant Rock (then the District Ranger for the Crooked River National Grassland on the Ochoco), asking to schedule a 2002 inspection of Gray Butte.

23.    In response, Oberdorfer requested that several site management issues be addressed during the inspection, including noncompliance with the site plan by other owners of facilities on Gray Butte; and Oberdorfer also asked that the Forest Service appoint the facility owners to the inspection team, to ensure that the inspectors had the requisite technical knowledge to conduct a proper inspection.  Oberdorfer also noted that no final action had ever been taken on his 1991 application.

24.    From September 22, 2002, to the present, defendant McMillin failed to follow through with his agreement (as agent of the Forest Service) to appoint the facility owners to the inspection team and failed to take reasonable steps to address the noncompliance with the site plan by other owners of facilities on Gray Butte.

25.    On Sept. 23, 2002, defendant Rock wrote to Western Radio, documenting the results of a September 17 inspection of the Gray Butte site.  Defendant Rock stated there were no problems with Slater's or Day Wireless's facilities; but found three problems with Western Radio's facilities.

a.    Rock stated that the westernmost tower was licensed only to be a microwave stand and was being used for a nonmicrowave antenna; and would have to be

PAGE 6 - PLAINTIFFS' FIRST AMENDED COMPLAINT

removed by December 31, 2002.

   b. Rock stated that Western Radio had not yet moved its equipment and wiring into a new replacement building facility, and that this would have to be completed by the same date.

   c. Rock stated that the roof coloring of the new building did not comply with the site plan.

  26. On October 8 Oberdorfer wrote to Rock asking for further explanation regarding these alleged problems; and explaining that the moving of equipment to the new building would cause hardship to Western Radio until completion of a new cell site in the new building, which had been delayed due to lack of delivery of a new controller. Oberdorfer noted that the other issues he had raised had not been addressed, and asked if they could be addressed during the next month.

  27. In a letter December 31, 2002, to Rock, Oberdorfer made the following comments:

   a. He noted again the need to have the facility owners on the inspection team, as the Forest Service personnel assigned to inspect did not have the requisite technical expertise to determine compliance. He noted that previously defendant McMillin and the facilities owners had agreed to inspection by the owners.

   b. He also noted that the site plan did not limit facilities to one tower nor did it designate that each tower was limited to a certain type of antenna. He noted that the site plan authorized Western Radio to have two towers, one 60 feet high and one 20 feet high, and that he was in compliance.

PAGE 7 - PLAINTIFFS' FIRST AMENDED COMPLAINT

c.      He noted that the roof was galvanized steel because that material is durable, and that a painted surface would not be durable given the ice that strikes the roof.  He noted that the site plan requires the sides of the structure to be painted, but not the roof.

d.      Finally, Oberdorfer suggested meeting at the end of January to discuss the various issues regarding the Gray Butte site.

28.      On February 4, 2003, Oberdorfer sent e-mail to Rock noting that he had received no response to its December letter.  Oberdorfer once again reiterated the need to bring the other facilities at the site into compliance and to process Western Radio's 1991 application to move its antennas to reduce interference.  Oberdorfer suggested meeting at the end of February.

29.      On February 21, 2003, the Ochoco National Forest issued its list of proposed actions, which stated that the Forest had decided to drop from the list the Gray Butte Electric Site Management Plan Update (which was to have included Western Radio's side hill antenna relocation).  This proposed action had been on the list of proposed actions for several years, with no action having been taken.

30.      That same day Oberdorfer sent e-mail to Rock noting that he had still received no response to his requests.  He noted that other than February 24 and March 3, the next two weeks were open for him to meet.

31.      Shortly thereafter Rock left and Kristen Bail took over his job as District Ranger for the Crooked River National Grassland.

32.      On May 8, 2003, defendant Bail told Oberdorfer that she had been instructed not to talk to Western Radio; and that all Western Radio matters were to go to defendant Sauser at the Regional Forest Service office.

PAGE 8 - PLAINTIFFS' FIRST AMENDED COMPLAINT

33.    The next day, Oberdorfer sent an e-mail to Sauser, with cc's to defendants Bail
and Timchak (then Ochoco National Forest Supervisor), enclosing a copy of the February 21,
2003 e-mail.  Oberdorfer noted that it seemed unusual to him that he was not allowed to speak to
the local contact person, but that he was willing to work with whoever the agency designated.
Given the odd instructions he had received from Bail, Oberdorfer asked if the Ochoco National
Forest's authority over site plans had been revoked; and asked how Sauser would like to proceed.

34.    On June 3, 2003, Oberdorfer sent an e-mail to Sauser asking when he might
expect a response to the May 9 e-mail.

35.    The next day Sauser sent an e-mail to Oberdorfer, stating that defendant Hsieh,
who was new to the Ochoco National Forest, would now be Western Radio's contact regarding
the special use/communication site issue at the Ochoco National Forest level.  Sauser stated:
"As mentioned previously in our communications, I believe it to be productive if we restrict our
communications to a written format."  He stated that there had been no changes in delegation to
the Ochoco Forest regarding communication sites.  Sauser stated that he would continue to
advise the Ochoco Forest on this and other special use matters.

36.    June 5, 2003, Oberdorfer sent e-mail to Hsieh, with copies to Bail and Timchak,
suggesting a meeting at the Gray Butte site the following week to discuss site plan compliance
and the 1991 application.

37.    On June 9, Hsieh e-mailed Oberdorfer and asked if they could instead meet June
24 or 26 to allow her time to read the application file and discuss technical issues with others.
That day Oberdorfer e-mailed to Hsieh noting that he would be out of town June 24 and would
prefer the 26th.

PAGE 9 - PLAINTIFFS' FIRST AMENDED COMPLAINT

38.     On June 11 Hsieh e-mailed Oberdorfer the following message:  "I have been advised to restrict communications to a written format.  This would not be possible if we meet out at the site.  As an alternative method to respond to your concerns, I am requesting that you write to us with your comments, issues, or questions.  The Forest will send you a written response."

39.     On June 18 Oberdorfer e-mailed Hsieh and noted that he was still seeking to have the site plan enforced and to have Western Radio's 1991 application acted upon.  He noted that there was already considerable documentation in the Forest Service files regarding these issues. He noted that since they would not be able to meet face to face, Hsieh should read through the files and come up with a plan so they could move forward on these issues.

40.     On June 23 Hsieh e-mailed Oberdorfer promising to read the file and noting that she would probably need to discuss the last inspection with the Rock and Bail.

41.     On July 1, 2003, Bail wrote to Oberdorfer stating that Hsieh had reviewed the files.  She stated that they did not agree that there were areas of major noncompliance at the Gray Butte site by the other facility owners.  She asked whether the items raised in the October 18 letter from Rock had been addressed.  She stated that Hsieh would visit the site that summer to check Western Radio's compliance.

42.     In that letter, Bail responded, finally, regarding the status of Western Radio's 1991 application to move its antennas.  She stated that the Forest Service had not had the resources to update and clarify the site plan, and so the application had not been further studied. She stated that the Forest was in the early stages of framing the 2004 Program for Work, and would discuss whether updating the site plan was a high priority within the lands and minerals

PAGE 10 - PLAINTIFFS' FIRST AMENDED COMPLAINT

program. She stated that, as an alternative, Hsieh was researching the feasibility of having a private contractor assist in updating the Plan. She stated that they would keep Western Radio apprised.

43.     On July 16, 2003, Oberdorfer e-mailed Bail, offering additional facts in support of his complaints about Day Wireless's and Slater's noncompliance with the site plan. He stated that Rock had not observed the areas of noncompliance because he did not have the skills necessary to conduct the inspection. Oberdorfer noted that he had been attempting to work with Rock to develop an effective inspection process, to no avail. Oberdorfer stated that wanted to work with Bail and Hsieh regarding these areas of noncompliance.

44.     In that letter, Oberdorfer also addressed the issues he had been required to address regarding his own site. He stated that he had installed a new microwave in the new building to reduce transfer down time during the transition to the new building, but then discovered that the batteries were defective, and had ordered new batteries. He noted, however, that he was a little reluctant to commit the estimated $10,000 to doing the transition without getting some progress on the issues of the other owners' noncompliance and on his 12-year-old application to move his towers. Regarding the roof issue, he referred Bail to his December 31 e-mail.

45.     Finally, regarding his 1991 application, Oberdorfer noted that he had received no reasonable explanation as to why revising the entire site plan was necessary; that side-hill antennas had been expressly allowed by the plan since 1982, and the Forest had previously authorized side-hill antennas for Slater at Gray Butte. He asked that the application be processed without further delay.

46.     In an August 26, 2003, e-mail, Hsieh told Oberdorfer that she was arranging for

an outside communications site specialist, Brent McBeth, to review and update the Site Plan, and to help reevaluate Western Radio's 1991 application.  She stated:  "Due to a lawsuit, there is no radio communication specialist in the Central Oregon area available to provide assistance at this site."

47.    On August 28, Oberdorfer e-mailed Hsieh, asking what was the purpose and need for revising the site plan.  He asked what the Forest proposed to do to bring the site into compliance.

48.    On September 15, Oberdorfer e-mailed Timchak, with copies to Hsieh and Bail, asking when he could expect the Forest to take action to enforce compliance with the site plan on the part of the other facility owners.

49.    On September 29 Hsieh e-mailed Oberdorfer stating that the outside consultant would do a site visit on October 7.

50.    On October 2, Oberdorfer e-mailed Hsieh wanting to know what the Forest's intentions were regarding the site visit; and noting that the District Ranger had refused to discuss Gray Butte with him.  He noted that his August 28 inquiry had never been answered.  He stated that he needed answers to his questions (especially regarding the purpose and need for the site plan update) before meeting, and asked for a postponement until those answers were forthcoming.  He proposed meeting October 28 or 29 if the Forest needed longer to get back to him with a response.

51.    On October 2 Bail wrote to Oberdorfer once again stating that the fall 2002 inspection had not indicated areas of noncompliance, and asking if Oberdorfer had a more detailed description of noncompliance.  She also restated the Forest Service's position that

PAGE 12 - PLAINTIFFS' FIRST AMENDED COMPLAINT

Western Radio was not in compliance with the site plan, but did not adequately address Oberdorfer's comments on those points.

52.    Regarding the reason for a site plan revision she stated that the last revision was in 1996 and that this was an appropriate time to review the site plan for changes or clarifications. She acknowledged that the Forest had been "tardy" in studying Western Radio's sidehill antenna application, but that they felt that a review of the site plan would be "efficient."

53.    On October 5, 2003, Oberdorfer e-mailed Bail and gave more details regarding Slater's noncompliance.  He reminded her that the extent of noncompliance was unknown because Slater had previously not allowed the other owners to inspect the inside of his facility. Oberdorfer asked Bail to schedule an inspection; appoint the owners to the inspection team; and give the owners thirty days to submit a report.  Oberdorfer also noted that the other owners had sometimes altered technical data so that it would appear to comply with the site plan.

54.    In that e-mail Oberdorfer also explained to Bail the facts regarding the hard work that had gone into coming to agreement on the 1996 site plan, and he stated that the plan did not need to be amended; rather it needed to be enforced.

55.    The outside consultant inspected the site on October 7, 2003.

56.    On January 21, 2004, Oberdorfer e-mailed Bail, with copies to Hsieh and Timchak asking about the status of Western Radio's 1991 application.

57.    On January 23, Bail wrote to Western Radio asking for more information regarding the 1991 application.  She asked for a specific form and equipment list; whether he had circulated the proposal to the other owners, and what the purpose of the proposal was.  She stated that a Certified Radio Frequency Radiation Engineer would have to study the proposal.

PAGE 13 - PLAINTIFFS' FIRST AMENDED COMPLAINT

She stated that the environmental analysis for the existing site plan did not analyze the impact of installing ground-mounted antennas at specific locations, and that site-specific environmental analysis would be required for the proposal to move the antennas.

58.    On February 4, 2004, Oberdorfer wrote to Bail, offering the following:

a.    He enclosed a copy of the long-ago completed form and the results of coordination that had been completed many years earlier with the other facility owners.  He noted that all of this had been furnished to Hsieh on October 2, 2003; and had originally been furnished to the Forest years earlier.

b.    He noted once again that the purpose was to reduce interference, because the only effective measure was to separate the antennas by a vertical 100 feet.

c.    He stated that it was impossible to perform a study to see if a single antenna would exceed FCC limits, without considering RF radiation from other stations at the site.  He stated the first step would be to inventory the RF radiation from the entire site, but that the other owners had refused to cooperate so he needed the Forest's assistance; and that if the Forest would schedule an inspection of all facilities and appoint him to the inspection team he could obtain the information necessary to do the study correctly.

d.    Regarding the environmental analysis issue, he thanked her for clarifying the process and asked what the schedule was for completing the required studies.

59.    On March 19, 2004, Oberdorfer e-mailed Timchak, with copies to Bail and Hsieh. Frustrated with the delay that had occurred in processing his application filed thirteen years earlier, he gave an overview of the delay that had occurred under Rock and Bail; noted that he was being required to conduct a study that the Forest Service had never requested of any

PAGE 14 - PLAINTIFFS' FIRST AMENDED COMPLAINT

applicant before, and without even giving Western Radio the ability to collect the required

information. He asked Timchak what he would do to ensure that the special use application

would be processed in a timely manner; and what he would do about Slater's noncompliance.

60. On March 22, 2004, Bail wrote to Oberdorfer, stating that the submitted proposal

and map were different from the 1998 documentation in the Forest Service's file, and that an

updated, current proposal was required. She stated that there were 1998 letters from the other

facility owners describing their concerns; and that the site had changed since the proposal was

submitted, so it needed to be resubmitted to the other owners. She briefly described the NEPA

process but stated that studies had not been scheduled, and that she wanted to see the results of

an RF study and owner comments before moving forward; and stated that Western Radio might

be required to fund the NEPA analysis. She stated that she realized this was not always the

process used in the past, but due to lack of funding and time the Forest Service had increasingly

required this method, especially for large projects.

61. On April 9, 2004, Oberdorfer e-mailed Timchak asking when he could expect a

response.

62. As Ochoco National Forest Supervisor, Timchak had final oversight over the

operations of the Ochoco National Forest and thus had participated as a decisionmaker in, and

had authority to halt, the unconstitutional actions and omissions the other defendants took which

harmed plaintiffs.

63. April 15 Bail wrote to Western Radio, citing a 1999 technical bulletin regarding

RF radiation. Regarding timeliness she stated: "We are processing your proposal through our

normal 'screening criteria,' which is a procedure outlined in our Forest Service Handbook.

PAGE 15 - PLAINTIFFS' FIRST AMENDED COMPLAINT

Regarding other issues, she referred back to other correspondence.

**Facts Regarding Individual Liability**

64.    Each of the individual defendants, between September 22, 2002, and the present, had some participation in the following actions and omissions which have harmed plaintiffs:

   a.    failure to follow through with the agreement to allow the Gray Butte facility owners to conduct site inspections;

   b.    failure to adequately inspect Slater's facility to determine the source of the interference and to require correction of that interference;

   c.    failure to adequately address the site management issues raised by plaintiffs, including noncompliance with the site plan by other owners of facilities on Gray Butte;

   d.    Failure to take final action on plaintiffs' 1991 application.

65.    The acts and omissions of each of the defendants, as alleged herein, were taken as a result of and in retaliation for plaintiffs' filing of the lawsuits against the Forest Service and its employees, which was protected conduct.

66.    By their actions and omissions as described herein, each of the defendants, under color of statute, ordinance, regulation, custom, or usage, and acting in both their individual and official capacities, subjected plaintiffs to the deprivation of rights, privileges, or immunities secured by the Constitution and laws, in that the actions and omissions were in retaliation for plaintiffs' filing of lawsuits against the Forest Service and its employees, and would unduly chill a person of ordinary firmness from engaging in future First Amendment activities.

67.    The defendants' actions and omissions were wanton, wilful, or in deliberate

disregard of plaintiffs' rights.

68.    As a direct and proximate result of the acts and omissions of defendants, plaintiffs have suffered and sustained damages, continue to suffer and sustain damages, and in the future will suffer and sustain damages, in amounts to be proven at trial, including loss of income and profits; loss of goodwill; mental anguish, emotional distress, depression, stress, anxiety, and humiliation.

69.    The acts and omissions of defendants were wilful and wanton or otherwise in reckless disregard of plaintiff's rights.  Punitive damages should be awarded to plaintiffs and assessed against each of the defendants to punish defendants for their acts and omissions and to deter defendants and others from engaging in such conduct in the future.

70.    Plaintiffs are entitled to their reasonable attorney fees and expenses pursuant to 42 U.S.C. § 1988, the Equal Access to Justice Act, 28 U.S.C. § 2412(d) et seq., the court's inherent powers, and Fed. R. Civ. P. 60.

71.    The amount of damages owing is ascertained or easily ascertainable by simple computation or by reference to generally recognized standards, and the time from which interest must run can be ascertained.  Plaintiffs are thus entitled to prejudgment interest on his damages.

72.    Plaintiffs' remedy at law is inadequate, and declaratory and injunctive relief is necessary to protect plaintiff and similarly situated entities.

### SECOND CLAIM FOR RELIEF
**(Administrative Procedures Act/National Forest Management Act --
Agency Action Unlawfully Withheld)**

73.    Plaintiffs adopt by reference the allegations in paragraphs 1 through 63.

74.    Plaintiffs' 1991 application and subsequent amendment and supplementary

PAGE 17 - PLAINTIFFS' FIRST AMENDED COMPLAINT

materials and their complaints about the other facility owners at Gray Butte were submitted pursuant to the National Forest Management Act, 16 U.S.C. 497.

75.      Defendants have unlawfully withheld and unreasonably delayed action on plaintiffs' 1991 application, and on plaintiffs' complaints about the other facility owners, and thereby violated the Administrative Procedures Act, 5 U.S.C. § 706(1).

76.      Plaintiffs are entitled to declaratory and injunctive relief pursuant to the APA, 5 U.S.C. 706(1).  Plaintiffs have no plain, speedy, and adequate remedy, in the ordinary course of law, other than declaratory and injunctive relief sought in this Complaint, because there is no other mechanism for compelling the defendants to take final action on plaintiffs' administrative appeal.

77.      Plaintiffs are entitled to their reasonable fees, costs, and expenses associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

### THIRD CLAIM FOR RELIEF
(Administrative Procedures Act/National Forest Management Act --
Arbitrary and Capricious Action)

78.      Plaintiffs adopt by reference the allegations in paragraphs 1 through 63.

79.      To the extent that the defendants did take action on plaintiffs' 1991 application and on his complaints regarding the other facility owners at Gray Butte under the National Forest Management Act, 16 U.S.C. 497, defendants' actions alleged herein were arbitrary, capricious, not in accordance with law, and without observance of procedures required by law, within the meaning of the APA, 5 U.S.C. § 706(2).

80.      Injunctive and declaratory relief is appropriate and necessary to remedy this APA violation.

PAGE 18 - PLAINTIFFS' FIRST AMENDED COMPLAINT

81.    Plaintiffs are entitled to their reasonable fees, costs, and expenses associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

## FOURTH CLAIM FOR RELIEF
### (Bivens Action -- Equal Protection -- "Class of One")

82.    Plaintiffs re-allege the allegations of paragraph 1 through 64 as if fully set forth herein.

83.    By their actions and omissions as described herein, each of the defendants, under color of statute, ordinance, regulation, custom, or usage, and acting in both their individual and official capacities, subjected plaintiffs to the deprivation of rights, privileges, or immunities secured by the Constitution and laws.

84.    In particular, defendants intentionally treated plaintiffs differently from others similarly situated and there was no rational basis for the difference in treatment.

85.    As a direct and proximate result of the actions and omissions described in this complaint, plaintiffs sustained actual damages, in an amount to be ascertained according to proof at trial.

86.    The acts and omissions of defendants were wilful and wanton or otherwise in reckless disregard of plaintiff's rights.  Punitive damages should be awarded to plaintiffs and assessed against each of the defendants to punish defendants for their acts and omissions and to deter defendants and others from engaging in such conduct in the future.

87.    Plaintiffs are entitled to their reasonable attorney fees and expenses pursuant to 42 U.S.C. § 1988, the Equal Access to Justice Act, 28 U.S.C. § 2412(d) et seq., the court's inherent powers, and Fed. R. Civ. P. 60.

88.    The amount of damages owing is ascertained or easily ascertainable by simple

PAGE 19 - PLAINTIFFS' FIRST AMENDED COMPLAINT

computation or by reference to generally recognized standards, and the time from which interest must run can be ascertained.  Plaintiffs are thus entitled to prejudgment interest on his damages.

89.    Plaintiffs' remedy at law is inadequate, and injunctive relief is necessary to protect plaintiff and similarly situated entities.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiffs demand judgment in their favor and against defendants for the damages, injunctive relief, declaratory relief, prejudgment interest, and reasonable costs and attorney fees sought in paragraphs 68-72, 76-77, 80-81, and 85-89, and for any other relief deemed appropriate by the court.

Respectfully submitted June 6, 2005.


 /s/ Marianne Dugan                    
Marianne Dugan, OSB # 93256
Attorney for Plaintiffs
259 E. 5th Ave., Ste 200-D
Eugene, Oregon 97401
(541) 338-7072

PAGE 20 - PLAINTIFFS' FIRST AMENDED COMPLAINT